82 F.3d 63
 Robert NAMI; Maurice Thompson; Bart Fernandez; Kenneth
Thompson; Kenneth B. Thompson, Appellant,
v.
William H. FAUVER, Commissioner; Joseph E. Butler,
Administrator; Willie Boggan, Asst.
Superintendent; Prem Sinha, Law Librarian.
 No. 95-5365.
 United States Court of Appeals,
Third Circuit.
 Submitted Pursuant to Third Circuit LAR 34.1(a)
Nov. 27, 1995.
Decided April 25, 1996.
 
 On Appeal from the United States District Court for the District of New Jersey; Mary Little Parell, Judge, D.C. Civil Action No. 94-cv-06083.
 Bart Fernandez, pro se.
 Kenneth B. Thompson, pro se.
 Dianne M. Moratti, Office of Attorney General of New Jersey, Division of Law, Trenton, NJ, for Appellees.
 Before STAPLETON, NYGAARD and LEWIS, Circuit Judges.
 OPINION OF THE COURT
 NYGAARD, Circuit Judge.
 
 
 1
 Kenneth Thompson appeals pro se from the district court's order dismissing his complaint. We will reverse the order and remand the cause to the district court for further proceedings consistent with this opinion.
 
 I.
 
 2
 On December 6, 1994, Robert Nami, Maurice Thompson, Bart Fernandez and Kenneth Thompson filed a pro se complaint under 42 U.S.C. § 1983, alleging that they were subjected to cruel and unusual punishment and denied access to the courts. The plaintiffs were inmates housed in protective custody[1] in the Administrative Close Supervision Unit (or "Unit") at the Wagner Youth Correctional Facility in Bordentown, New Jersey. The defendants are: William Fauver, Commissioner of the New Jersey Department of Corrections; Joseph Butler, Wagner's Administrator; Willie Boggan, the Assistant Superintendent of the Unit; and Prem Sinha, the law librarian at Wagner. The plaintiffs seek declaratory and injunctive relief, and compensatory and punitive damages.
 
 
 3
 The defendants moved under Fed.R.Civ.P. 12(b)(6) to dismiss on the grounds that: the complaint does not allege specific conduct by the defendants that has harmed the plaintiffs; the defendants cannot be held liable under § 1983 on the basis of respondeat superior; and the defendants are state officials who are being sued for damages in their official capacities and are therefore immune from suit under the Eleventh Amendment. The district court found that, to the extent the plaintiffs sought injunctive relief, the defendants were not immune under the Eleventh Amendment, but agreed that the complaint failed to specify which defendants were responsible for the adoption and execution of the various policies and practices at issue by plaintiffs. Rather than allowing the plaintiffs to amend their complaint to correct that deficiency, the district court granted the motion to dismiss.
 
 II.
 
 4
 Because the district court's final order granted the defendants' motion to dismiss the complaint under Fed.R.Civ.P. 12(b)(6), our review is plenary. We must determine whether, under any reasonable reading of the pleadings, the plaintiffs may be entitled to relief, and we must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom. Holder v. City of Allentown, 987 F.2d 188, 194 (3d Cir.1993). The complaint will be deemed to have alleged sufficient facts if it adequately put the defendants on notice of the essential elements of the plaintiffs' cause of action. Since this is a § 1983 action, the plaintiffs are entitled to relief if their complaint sufficiently alleges deprivation of any right secured by the Constitution. Id. In considering a Rule 12(b)(6) motion, we do not inquire whether the plaintiffs will ultimately prevail, only whether they are entitled to offer evidence to support their claims. Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Thus, the district court's order granting the defendants' motion to dismiss will be affirmed only if it appears that the plaintiffs could prove no set of facts that would entitle them to relief. Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).
 
 III.
 Cruel and Unusual Punishment
 
 5
 The plaintiffs' claim of cruel and unusual punishment is based on the following allegations:
 
 
 6
 1. Inmates at the Unit are "double celled," housed two to a single, 80-squarefoot cell with only one bed, so that one of them must sleep on the floor by the toilet. Cells have solid doors with only a four inch wide window for cell inspection, making it difficult to summon help. Inmates often share cells with others who suffer from psychiatric problems and/or who are violent felons, and non-smokers must often share cells with smokers. Floor space is minimal, effectively confining inmates to their beds. Also, the ventilation system often shuts down for hours at a time. Double celling has resulted in rapes and other assaults, as well as psychological stress. Inmates who refuse to "double up" have been punished with periods of administrative segregation and loss of good time.
 
 
 7
 2. Inmates must spend 24 hours a day in their cells except for out of cell recreation, visits and half-hour to one-hour job assignments.
 
 
 8
 3. Out of cell recreation is limited to one two-and-a-half hour period two days per week, in contrast to the seven day per week policy enjoyed by the general population and protective custody inmates in other facilities. Moreover, during outdoor recreation, inmates are denied bathroom access, resulting in unsanitary conditions in the exercise yard. Those who cannot wait to use the bathroom inside risk punishment.
 
 
 9
 4. Access to drug and alcohol programs required by the parole board, and to jobs and educational programs, is more restricted for inmates in protective custody than for inmates in the general population. General population inmates work at the Unit, even though a statute prohibits inmates not under protective custody from entering the protective custody area.
 
 
 10
 5. When transported to other locations--for example, to visit the doctor--inmates must wear a painful device, the "black box," which is so uncomfortable that inmates are deterred from seeking medical or dental help; general population inmates apparently do not have to wear this device, nor do inmates in protective custody at other facilities.
 
 
 11
 6. One of the plaintiffs, Kenneth Thompson, alleges that his requests to see a dentist and an eye doctor have been ignored.
 
 
 12
 Rather than examining the plaintiffs' allegations concerning the conditions of their confinement as a whole, the district court split these allegations into three categories. First, the court analyzed the double celling allegations, inferred from Rhodes v. Chapman, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), that double celling is not per se unconstitutional, and concluded that the plaintiffs therefore failed to state a claim in that regard. Second, the court addressed the allegation that there have been increased rapes and other assaults, finding that the claim based upon these allegations lacked merit because the plaintiffs failed to show "deliberate indifference," citing Young v. Quinlan, 960 F.2d 351, 360 n. 22 (3d Cir.1992). Finally, the court treated the remaining Eighth Amendment allegations as amounting to an equal protection claim, based on a comparison of the plaintiffs' treatment with that of the general population of the prison. It likewise found this claim to be without merit.
 
 
 13
 We conclude that the district court erred. While Rhodes may stand for the proposition that double celling does not per se amount to an Eighth Amendment violation, it does not stand for the proposition that double celling can never amount to an Eighth Amendment violation. The Supreme Court held only that, under the circumstances of that particular case, the double celling in question did not violate the plaintiffs' Eighth Amendment rights. The Court noted that
 
 
 14
 No static 'test' can exist by which courts can determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.
 
 
 15
 Id. at 346, 101 S.Ct. at 2399 (citation and internal quotations omitted). The court went on to state that:
 
 
 16
 conditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment.... * [Conditions may constitute cruel and unusual punishment if] they result[ ] in unquestioned and serious deprivations of basic human needs ..., [which] deprive inmates of the minimal civilized measure of life's necessities....
 
 
 17
 Id. at 347, 101 S.Ct. at 2399.
 
 
 18
 In other words, it is implicit in Rhodes that double celling can amount to an Eighth Amendment violation if combined with other adverse conditions. Thus, in Tillery v. Owens, 907 F.2d 418 (3d Cir.1990), we noted that, to determine whether conditions of confinement violate the Eighth Amendment, it is necessary to examine the totality of the conditions at the institution, and we held that double celling at SCI Pittsburgh violated the Eighth Amendment because of those conditions. Id. at 426-427. Relevant considerations include the length of confinement, the amount of time prisoners must spend in their cells each day, sanitation, lighting, bedding, ventilation, noise, education and rehabilitation programs, opportunities for activities outside the cells, and the repair and functioning of basic physical facilities such as plumbing, ventilation, and showers. Id. at 427. Here, the allegations in the complaint raise another significant consideration; that plaintiffs were subject to sexual assaults, and that the defendants, by failing to protect plaintiffs adequately, were deliberately indifferent to the potential for this type of harm. If proven, these allegations, irrespective of whether the harm resulted from double celling or other conditions of confinement, could establish deliberate indifference as contemplated by Rhodes v. Chapman.
 
 
 19
 As in Rhodes, courts finding double celling permissible have emphasized that general prison conditions were otherwise adequate. Id. We stress that the conditions in Rhodes were different in many ways from those alleged in the case before us (and considerably different from the grim conditions related in Tillery ). The cells in Rhodes were smaller. Nonetheless, cells housing two inmates had two-tiered bunk beds, each cell had heating and air circulation vents and a built-in radio, one wall consisted only of bars, and between 6:30 a.m. and 9:30 p.m. inmates had access to "dayrooms" (designed to be counterparts of a living room at home, each included a television, card tables and chairs).
 
 
 20
 The district court failed to analyze these relevant considerations. Nor did the court discuss double celling in the overall context of prison conditions. To that extent the district court erred.[2] Although the complaint alleged that the increase in rapes and other assaults was a result of double celling, the district court treated this allegation separately. The court found that the plaintiffs did not state a claim because they had failed "to indicate any conduct by the defendants which could amount to 'deliberate indifference.' " Dist.Ct. op. at 9, citing Young v. Quinlan, 960 F.2d 351, 360 n. 22 (3d Cir.1992). Here, the court also erred.
 
 
 21
 In Wilson v. Seiter, 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991), the Supreme Court held that to establish an Eighth Amendment violation an inmate must allege both an objective element--that the deprivation was sufficiently serious--and a subjective element--that a prison official acted with a sufficiently culpable state of mind, i.e., deliberate indifference.
 
 
 22
 It cannot be wholly determined from the record whether in this case prison officials actually displayed deliberate indifference. Nonetheless, this complaint states that "letters have been written to the [administration] concerning all matters set forth in the complaint. All requests for administrative remedies were refused." This suggests that the defendants were on actual notice by plaintiffs' reports of rape, violence and the other conditions alleged in their complaint. By itself, such notice may not equal proof of deliberate indifference; nevertheless, it directly contradicts the district court's tacit conclusion, which has no support in the record, that plaintiffs could prove no set of facts establishing deliberate indifference or otherwise entitling them to relief.
 
 
 23
 Finally, the district court erred in its consideration of the plaintiffs' remaining Eighth Amendment allegations. The court stated that
 
 
 24
 there is no support for the assertion that plaintiffs' constitutional rights are being violated by denying them the same 'rights and privileges' afforded to inmates in the general population and this Court defers to the judgment of the prison officials in adopting and executing policies and practices that they believe, in their discretion, are needed to preserve internal order and to maintain institutional security.
 
 
 25
 Dist.Ct. op. at 9-10. That may be true (although, since the defendants did not have an opportunity to explain the justifications for these "policies and practices," the court's assumption that they are legitimate is premature); however, the plaintiffs appear to have raised these allegations as part of their Eighth Amendment claim, not merely as an equal protection claim. For example, the plaintiffs complain about use of "black boxes," not simply because general population prisoners are not subjected to them, but because they are so uncomfortable that they deter inmates from seeking medical and dental help. For the reasons stated above, these remaining allegations should have been considered along with the issue of double celling, and should at least have been considered as part of the plaintiffs' Eighth Amendment claims.
 
 
 26
 Thus, with regard to the plaintiffs' Eighth Amendment claims, we conclude that the district court erred. Based upon the record before us, we cannot say that the plaintiffs would be unable to prove that prison conditions were objectively unacceptable, and that prison officials were deliberately indifferent to plaintiffs' plight. We note that the district court entertained, but rejected (Dist.Ct. at 5), the possibility that plaintiffs may be able to satisfy some deficiencies in their original pleading by filing an amended complaint. Plaintiffs may be able to allege in an amended complaint, for example, sufficient facts to support a finding that some defendants displayed deliberate indifference to certain harms, or that all officials were deliberately indifferent to the possibility that the conditions under which they housed the plaintiffs significantly increased the possibility of such well-known harms as prison rape.
 
 IV.
 Access to the Courts
 
 27
 The plaintiffs' denial of access to the courts claim is based on the following allegations. Protective custody inmates are denied access to paralegals or other persons trained in law who could assist them with drafting legal papers. Paralegals are only available to protective custody inmates facing disciplinary charges and defendant Sinha refuses to help protective custody inmates prepare habeas corpus petitions or civil complaints. Moreover, Sinha has attempted to frustrate the plaintiffs in this case by delaying return of documents and failing to make copies of legal documents. Protective custody inmates are effectively prevented from helping each other by a policy prohibiting them from talking to each other through the doors and from passing items between cells; violators of that policy risk disciplinary action. In addition, prisoners are faced with a Catch 22-style problem: in order to obtain access to legal materials, inmates must submit written requests for specific materials; however, they cannot effectively do so because they lack access to the very legal materials that would advise them which materials to request. The plaintiffs also allege that everyone who has attempted to bring a civil complaint to attack these procedures has been transferred.
 
 
 28
 As we stated in Abdul-Akbar v. Watson, 4 F.3d 195, 204 (3d Cir.1993), the standard in resolving a claim of denial of access to the courts is
 
 
 29
 whether the mix of paralegal services, copying services and available research materials can provide sufficient information so that a prisoner's claims or defenses can be reasonably and adequately presented.
 
 
 30
 As with claims involving double celling, in addressing a claim of denial of access to the courts "each legal resource package must be evaluated as a whole on a case-by-case basis." Id. at 203.
 
 
 31
 However, just as the district court failed to address the plaintiffs' double celling claims as a whole, in addressing their claim of denial of access to the courts, the district court only analyzed one allegation, denial of access to paralegals. Moreover, the court addressed it by relying on defendant Boggan's affidavit in an unrelated case in which he states that paralegals are available on written request to help inmates with any legal problem or lawsuit. Because the plaintiffs did not allege that they had submitted written requests, the district court held that they had failed to state a claim of denial of access to the courts.
 
 
 32
 The district court erred here as well. In choosing to believe Boggan's affidavit, the court failed to take the allegations in the complaint as true--as it must in considering a motion to dismiss under Rule 12(b)(6). In addition, the court failed to address the remaining allegations at all. Since the plaintiffs' allegations are not self-evidently false, and since their allegations do not facially indicate that the plaintiffs could not state a claim, the district court erred by granting the defendants' motion to dismiss.
 
 V.
 
 33
 In conclusion, the district court should not have granted the defendants' motion to dismiss under Rule 12(b)(6). We will reverse the judgment of the district court and remand the matter for further proceedings consistent with this opinion.
 
 
 
 [1]
 Protective custody inmates are those whose well-being might be imperilled were they to remain in the general population
 
 
 [2]
 Since under Tillery the plaintiffs' other Eighth Amendment claims are unavoidably part of the analysis of the double celling issue, we need not address them separately in detail here